MINOT DENNETT *vs.* LUCIUS WILMERDING & others.

Suffolk.    May 21, 1935. — June 25, 1935.

Present: RUGG, C.J., PIERCE, FIELD, LUMMUS, & QUA, JJ.

*Contract*, Rescission, Performance and breach.    *Stockbroker.    Damages*,
For breach of contract.

Where a stockbroker holding securities on a margin account of a cus-
tomer sold them in breach of the parties' contract, he did not so
repudiate the entire contract as to entitle the customer to rescind it,
and the customer's sole remedy was to recover damages for the breach;
and since the customer could have replaced the securities without
loss within a reasonable time after receiving notice of the sale, he was
entitled to nominal damages only.

CONTRACT.    Writ dated January 15, 1930.

The action was tried in the Superior Court before *Sisk*,
J., who ordered a verdict for the plaintiff in the sum of $1.
All parties alleged exceptions.

*Lee M. Friedman*, (*F. L. Kozol* with him,) for the plaintiff.
*S. H. Babcock*, for the defendants.

PIERCE, J.    This is an action of contract with common
counts for money had and received and counts for breach of
contract.    The answer of the defendants is a general denial.
The case was tried to a jury.    At the close of the evidence
the judge directed a verdict for the plaintiff in the sum of $1.
To this ruling both the plaintiff and the defendants excepted.
The defendants waive their exceptions if the plaintiff's ex-
ceptions are overruled.

The plaintiff's "concern is directed to sustain the plain-
tiff's exceptions on the question of damages."    During the
trial the plaintiff excepted to the admission of certain
evidence and to the refusal to give certain instructions.
The witnesses for the plaintiff were L. Guy Dennett (here-
inafter called Mr. Dennett) and his son, Ellis H. Dennett.
On direct examination Mr. Dennett testified, in sub-
stance, that he was the plaintiff's brother and had been a
lawyer for forty years.    He first went to the defendants on

August 20, 1929, with his son Ellis H. Dennett and there met and talked with one Curtis. At that time the plaintiff had an account with Paine, Webber and Company. The witness handled this account and later his account with the defendants. On August 20, 1929, he transferred $3,385.27 from the plaintiff's account at Paine, Webber and Company to the defendants. On August 22, 1929, he gave Curtis an order to buy one hundred American Superpower shares and said to him, "I want to buy one hundred shares of American Superpower which will ultimately be paid for and I want it understood that the stock will not be sold out, if they ever required more margin to let me know and I would take care of it but that this stock is not to be sold out in any event," and Curtis replied, "All right." The witness did not "recall saying anything about paying for the stock at that time," which "was listed on the stock exchange and dealt in by the public." He stated that later that day Curtis told him that he had bought the stock and had sent him a confirmation; that "Curtis said the shares were to be carried on margin and we figured that there was fifty per cent margin at the time"; and that he told Curtis to send notice of margin requirements "to my house and [I] left my address with him." He further testified that he received the confirmation slip covering this purchase but did not read the legend on it or ever talk about it. It is in evidence that all confirmation slips from the defendants to the plaintiff bore the following legend: "It is agreed between broker and customer: 1. That all transactions are subject to the rules and customs of the New York Stock Exchange, Boston Stock Exchange, or other Exchange and their Clearing Houses. 2. That all securities from time to time carried in the customer's marginal account, or deposited to protect the same, may be loaned by the broker, or may be pledged by him, either separately or together with other securities, either for the sum due thereon or for a greater sum, all without further notice to the customer. 3. That when the margin is nearing exhaustion such securities may be sold and short sales covered in our discretion without notice."

On October 18, 1929, the defendants sent the plaintiff

a margin call for $600 addressed to the plaintiff, 19 Burnham Street, Belmont.   Mr. Dennett complied by arranging through his son to have a transfer to the defendants of $600 from the account of a Mrs. Nichols, who was the son's mother-in-law, and the plaintiff received from the defendants a credit receipt dated October 21, 1929.   On October 23, 1929, the witness received a margin call for $1,000 similarly addressed, and immediately went to the defendants with the plaintiff's check, for which he had written when he received the $600 call.   He was given or mailed a receipt dated October 23, 1929, to the plaintiff for $1,000. The plaintiff is described as a resident of Detroit, Michigan. On Saturday, October 26, 1929, the witness received a margin call for $1,000 similarly addressed and he telephoned Curtis he would come in.   In the afternoon of Tuesday, October 29, 1929, he delivered to Curtis ten shares of Electric Bond & Share Company, certificate dated August 26, 1929, belonging to his daughter, Jessie D. Wellington, who had indorsed it in blank.   The witness told Curtis that he "wanted it understood that this stock was not to be sold out. . . . 'If more is necessary to save the account let me know and I will put it right up.' " He testified that Curtis replied, "All right."   He was given a receipt, which, omitting caption and signature, reads: "Received of Minot S. Dennett, Esq., 10 Shs. Electric Bond & Share Comm   Cr. a/c NY/042801."   The witness testified that the next thing he heard was that the account had been sold out at the opening on October 30, 1929.   He received a confirmation slip dated October 30, 1929, of the sale of one hundred shares of American Superpower at $21.25 per share for a total of $2,108.50 for the plaintiff's account.   On this confirmation slip was printed the legend above quoted in full.   He testified that the confirmation slip was his first knowledge of the sale and that he did not know what had become of the Electric Bond & Share.   He immediately telephoned Curtis, who said that the shares of Electric Bond & Share had also been sold.   He received a statement of the account with the defendants dated November 1, 1929, showing both sales and a credit balance remaining of $488.38, and also

a confirmation slip from the defendants dated November 1, as of October 30, 1929, reciting the sale of ten shares of Electric Bond & Share at $67 per share, for a total of $664.60, and bearing the same legend. He testified that he saw Curtis after receiving this and said "if the defendants did not intend to do anything I would have to buy back 10 shares to replace those belonging to my daughter." Speaking of a time before the sale, Mr. Dennett testified that "No further margin was put up by me. I never received any further margin calls, before the account was sold out. I was never notified that the defendants required any more margin or that they intended to sell."

The witness testified that he consulted an attorney who sent a letter dated November 1, 1929, addressed to Gray and Wilmerding, which in part reads: "We understand that Mr. Dennett had previously notified you that he was proposing to take up this stock and would pay for the whole of it if you required it. There was no agreement or understanding at any time that any particular amount of margin should be kept for this account, but he complied with your request for payments as they were made from time to time. Under such circumstances, unless you are prepared to deliver this stock on the payment of the balance that is due on the account, we shall be obliged to protect our client's rights by such measures as may be necessary. We also want the Electric Bond & Share stock. You have given no information about it. Perhaps in the confusion of the day you did not realize that this stock was in this account. We would like your prompt answer." The defendants replied to the attorney's letter on the same day by a letter which stated that the plaintiff owed the defendants $2,284.72 on account, against which the total value of the securities therein at the close of business on October 29 was $2,495, which was not a sufficient margin, and that the account was sold out at the opening on October 30, 1929. On November 6, 1929, the plaintiff's attorney wrote to the defendants restating what was said in the letter of November 1, 1929, and making certain inquiries as to the time of day the stocks were sold. On November 7, 1929, the defendants replied to this letter as

follows: "Answering your letter of November 6 requesting information relating to sales of securities made by us for the Account of Mr. Minot S. Dennett, we beg to state that on October 30 at 10:17 A.M. we instructed our New York office to sell 10 shares of Electric Bond & Share at the market and the 10 shares were sold on the New York Curb Market through Friedman & Torney to Grubbell Nordhouse at 67. We instructed our New York office at 10:22 A.M. to sell 100 shares American Super-Power at the market and the 100 shares were sold on the New York Curb market through Friedman & Torney to J. L. McCormack at 21¼."

Later, the witness ordered the defendants to buy ten shares of Electric Bond & Share, and received a confirmation slip dated November 26, 1929, from the defendants. This stock cost $772.50 and it changed the credit balance of $488.38 to a debit balance of $284.12, from which interest was deducted, making a final debit balance of $282.74 which was paid by check on December 2, 1929. The certificate for the said ten shares was received by letter of transmittal dated December 10, 1929, and was the same certificate the witness had previously deposited as margin with the defendants. October 31, 1929, was Thursday. The stock exchange was closed the following Friday and Saturday and reopened on Monday, November 4, 1929. It was also closed on November 5 and 9. Before the trial it was stipulated and agreed "that the value of American Super-power and Electric Bond & Share common stock, at the times concerned in this action, shall be taken from the Wall Street Journal." It was stipulated that American Super-power stock had sold at varying prices between October 15 and November 15, as low as $15 on November 13, and as high as $29.75 on November 4, and that Electric Bond & Share Company stock had sold as low as $50.25 on November 13 and as high as $91.75 on November 4. These values taken from the Wall Street Journal were admitted but subject to the objection and exception of the plaintiff as to all figures prior to October 30, and subsequent to October 31, but the plaintiff did not question the accuracy of the figures. For the reason that it is not in dispute that the plaintiff

could have "purchased shares of stock to replace those sold by the defendants within a reasonable time after such sales at substantially the same prices or less than those for which the sales were made," the judge ruled as a matter of law that the damages for the breach of the contract would be nominal and directed the jury to return a verdict for $1, "a finding for the plaintiff in damages of one dollar."

On principles of rescission, the plaintiff contends that he is entitled to recover back the amount he had advanced to the defendants. His right depends upon the contract. His argument is predicated on the theory that the defendants in wrongfully selling the plaintiff's securities were guilty of such a repudiation of the contract as to entitle the plaintiff to rescind and recover the consideration paid by him. We assume for the purpose of discussion that the sale of the securities was wrongful. It is true that where margin is advanced to a broker and the customer's orders to buy are not executed at all or are improperly executed, as in the case where the broker sells his own securities to the customer, or when the broker is guilty of actual or constructive fraud, the customer may rescind the agreement and recover back his margin. *Todd* v. *Bishop,* 136 Mass. 386, 395. *Crehan* v. *Megargel,* 235 Mass. 279, 283. *Wisbey* v. *Alan Shepard & Co. Inc.* 268 Mass. 21, 22. *Quirk* v. *Smith,* 268 Mass. 536, 540. *Plumer* v. *Houghton & Dutton Co.* 281 Mass. 173, 175. In the case at bar the plaintiff does not contend that the defendants obtained by fraud the money with which his account was opened, nor that the defendants did not make actual purchases of securities which were carried on the plaintiff's account. As the order was properly executed the plaintiff has no right to rescind on account of any acts done by the defendants up to that time. *Harris* v. *Friedman,* 245 Mass. 479, 482. Thereafter the defendants held the stock in the plaintiff's behalf, the beneficial ownership being in the plaintiff and the legal title in the defendants. Compare *Palley* v. *Worcester County National Bank,* 290 Mass. 501, 508. If sales of the plaintiff's securities were thereafter made by the defendants in violation of the agreement under which they were held, the plaintiff is remitted

to his action for damages for such unauthorized sale. *Stewart* v. *Johnson*, 252 Mass. 287, 289. *Papadopulos* v. *Bright*, 264 Mass. 42, 47.

The plaintiff's next contention is that he is entitled on the facts to more than nominal damages and that the trial judge misinterpreted the rule of *Hall* v. *Paine*, 224 Mass. 62; *S. C.* 230 Mass. 62. The rule in this Commonwealth is well settled that in circumstances as in the case at bar the customer is entitled to nominal damages only when he could have purchased stocks to replace those wrongfully sold, within a reasonable time after such sales at substantially the same prices as those for which the sales were made. *Hall* v. *Paine*, 224 Mass. 62, 65. *Stewart* v. *Johnson*, 252 Mass. 287, 289. In the case at bar the accuracy of the figures determining the value of the stock sold and covering a reasonable period after the plaintiff's brother received notice, on November 1, 1929, of the sales, is not controverted. These figures show that the stock could have been replaced at prices below those at which the wrongful sales were made. The case at bar is governed by the above stated rule. The plaintiff argues that the rule works a hardship on the innocent party, since the latter may not be fully compensated in damages if he replaces stock at a price in excess of the price at which the stock was wrongfully sold. The plaintiff made no purchase of stock at any price until almost a month after his brother had knowledge of the wrongful sales, at which time the order for the purchase of ten shares of Electric Bond & Share was given. If the stock had been replaced at a higher price immediately after the sales and the price had fallen thereafter, a stronger case for special damages would have been made out. See *Hall* v. *Paine*, 224 Mass. 62, 69. He could have placed himself in the position he would have been in had there been no sale of his securities. In the absence of such evidence the plaintiff is entitled to nominal damages only, as the trial judge ruled. *Papadopulos* v. *Bright*, 264 Mass. 42, 47. The fact that, upon the purchase of ten shares of Electric Bond & Share Company to replace those sold, the defendants delivered the same certificate which they had received from

the plaintiff's brother is immaterial, and, in fact, the plaintiff makes no argument therefrom that the defendants were guilty of breach of duty in the matter or that he was harmed thereby.

We have considered all the points argued by the plaintiff. It results that the plaintiff's exceptions are overruled. The defendants' exceptions are therefore waived.

*So ordered.*